IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

THE BROOKLYN UNION GAS COMPANY,

          Plaintiff,

    -against-

EXXON MOBIL CORPORATION,

          Defendant.

**COMPLAINT**

Civil Action

Plaintiff The Brooklyn Union Gas Co. d/b/a National Grid NY, for its Complaint against Defendant Exxon Mobil Corporation, alleges as follows:

## I. INTRODUCTION

1.     This is a civil action for declaratory and injunctive relief arising out of the disposal into the environment and storage of solid and hazardous wastes at the historical facility owned and/or operated by Defendant Exxon Mobil Corporation ("ExxonMobil" or "Exxon") and its corporate predecessors, Charles Pratt & Co., Astral Oil Company, and Standard Oil, adjacent to the Bushwick Inlet and the East River in Brooklyn, New York.

2.     Plaintiff, The Brooklyn Union Gas Company d/b/a National Grid NY ("National Grid"), is a New York corporation located at One MetroTech Center, Brooklyn, New York 11201.

3.     Defendant ExxonMobil is a New Jersey corporation with a principal place of business at 5959 Las Colinas Boulevard, Irving, Texas 75039-2298 and a registered agent at Corporation Service Company, 830 Bear Tavern Road, West Trenton, New Jersey 08628-1020.

4.      Upon information and belief, Exxon is the corporate successor to Charles Pratt & Co., Astral Oil Company, and Standard Oil.

5.      Exxon and/or its corporate predecessors Charles Pratt & Co., Astral Oil Company, and Standard Oil owned, managed, and/or operated the Pratt Works Refinery (the "Refinery" or the "Refinery Site").

6.      The Pratt Works Refinery in Brooklyn, New York comprised Block 2294 (between N. 10th Street and N. 11th Street, west of Kent Avenue and separated from Block 2287 by N. 11th Street), Block 2277 (between N. 12th Street and Bushwick Inlet, east of East River and west of Kent Avenue), known as N. 12th Street Refinery or N. 13th Street Plant; portions of Block 2282 (east of Kent Avenue, between N. 12th Street and N. 13th Street separated from Block 2277 by Kent Avenue and separated from Block 2288 by N. 12th Street); and the site of the former Eagle Oil Works on portions of Block 2279 (west of Berry Street, between N. 13th Street and N. 14th Street).

7.      The Refinery manufactured kerosene from coal and/or crude petroleum and produced naphtha and lubricant oils.  Constructed in the 1860s, the facility utilized numerous gravitational and/or physical or chemical oil/water/solid separation units, such as ditches and other conveyances, sumps, stormwater units, tanks, induced air flotation units, and impoundments. These separation units generated sludges that were discharged and released to the environment.

8.      The Refinery used over forty tanks holding tar, crude oil, and refined materials that generated tank bottoms, which were discharged and released to the environment.  In addition, the materials contained within these tanks came into contact with or became entrained with the tank bottoms before they were handled, stored, treated, and/or disposed of into the environment.  Many structures contained asbestos, which was also disposed of into the environment.  Exxon and/or its

corporate predecessors Charles Pratt & Co., Astral Oil Company, and Standard Oil also contributed to the handling, storage, treatment, and/or disposal of various solvents, acids, and catalysts into to the environment.

9.      The Refinery was among the world's largest refinery operations through the 1880s. Operations at the Pratt Works Refinery continued through the 1920s.  During its decades of operation, ExxonMobil and/or its corporate predecessors contributed to the handling, storage, treatment, and/or disposal  into the environment of hazardous substances such as sludge generated from separation units, emulsion solids, cleaning sludges, tank bottoms, storage tank sediments, spent catalyst, waste oil, and various materials that came into contact with these hazardous substances or became entrained with these hazardous substances, such as gasoline, and/or petroleum.  The constituents from these substances including metals, volatile organic compounds ("VOCs"), and semi-volatile organic compounds ("SVOCs") also came to be located on and near the Refinery Site.  In addition, these hazardous substances came into contact with or became entrained with gasoline and other petroleum products that were disposed of into the environment at the Refinery Site.

10.      Defendant and/or its corporate predecessors caused or contributed to the past or present handling, storage, treatment, and disposal into the environment of solid and hazardous substances that remain onsite at the Refinery Site in a manner that may present an imminent and substantial danger to health or the environment.

11.      The site of Plaintiff's historical Williamsburg Works Manufactured Gas Plant ("Williamsburg MGP Site") was adjacent to and bordered on two sides by the Pratt Works Refinery.

12.     Defendant Exxon and/or its corporate predecessors caused or contributed to the disposal into the environment of solid waste and hazardous substances at the Williamsburg MGP site, and solid waste and hazardous substances from the Refinery have migrated to the Williamsburg MGP Site.  These substances remain onsite in a manner may present an imminent and substantial danger to health or the environment.

13.     This action is brought under the citizen suit provision of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6972(a)(1)(A) and (B).

14.     Plaintiff seeks a judgment against Defendant awarding injunctive relief, civil penalties up to $27,500 per day per violation of RCRA, and costs of litigation.

## II.  JURISDICTION AND VENUE

15.     This court has jurisdiction over this action's federal claims pursuant to 42 U.S.C. § 6972(a)(1)(A) and (B) and 28 U.S.C. § 1331.

16.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because the historical facility owned and/or operated by Defendant was located within the district.

## III.  BACKGROUND AND ALLEGATIONS

A.     Kerosene Refineries

17.     In the mid-1800s, American energy companies began to construct refineries to extract kerosene from coal and petroleum.  Kerosene was extracted from coal by heating it in a vessel known as a retort, which permitted vapor to condense and separate from the coal.  Kerosene was extracted from crude petroleum through a complex heating and cooling distillation process.

18.     Less volatile and flammable than gasoline, kerosene was widely used for heating, lighting, and cooking beginning in the nineteenth century.  Kerosene is still in use today for cooking, as a lubricant, as an ingredient in pesticides, and as a jet fuel.

19.     Based on information and belief, then non-marketable waste materials, including gasoline, were disposed of in various ways, including dumping onto land or water bodies where such materials became entrained with other hazardous substances.

20.     On information and belief, hazardous substances present at the Refinery Site are consistent with those associated with kerosene refineries.

B.     Petroleum Bulk Storage Terminals

21.      Petroleum bulk storage terminals are facilities that handle and store petroleum products in on-site tanks, drums, or other containers.  These storage units can be both aboveground and underground.  These facilities also load and unload products from boats, trains, or trucks and engage in a number of maintenance activities onsite.

22.     Terminals can house any number of petroleum products, including gasoline, kerosene, and diesel petroleum fuel.  Waste oil, cleaning solvents, maintenance machinery, hydraulic fluids, lubricants, fuel, electrical equipment, paints, detergents, cleaners, and varnishes used to maintain the equipment, buildings, and vehicles onsite are also commonly stored at petroleum bulk storage terminals.

23.     Given the nature of the material stored at these terminals, the facilities generate industrial hazardous waste.  It is not uncommon for contaminant releases to occur during loading, unloading, cleaning, hydrostatic water tests, tank cleanings, oil/water/solid separator cleanings, and during precipitation events.  Hazardous substances disposed of and released from petroleum bulk storage terminals include oil, grease, heavy metals, PAHs, VOCs, SVOCs, polychlorinated

biphenyls ("PCBs"), waste oil, separator sludge, and tank bottom wastes.  On information and belief, petroleum and petroleum products released by bulk storage terminals can become entrained with and facilitate the migration of various hazardous substances.

24.     Petroleum bulk storage terminals either store products for transport by others or transport their stored products to the products' ultimate users or to other storage facilities. Petroleum can be transported from the facilities via trucks, barges, or pipelines running through the facility.

25.     On information and belief, petroleum bulk storage terminals release hazardous substances into the environment in a variety of ways, including spills during on-loading and off-loading, spills during equipment maintenance, tank cleanings, leaks hydrostatic water tests, tank clearings, oil/water/solid separator cleanings, and during precipitation events.

26.     On information and belief, hazardous substances located at the Refinery Site are consistent with those associated with petroleum bulk storage terminals.

C.     ExxonMobil's History of Refinery Operations

27.     Construction of the Pratt Works Refinery began in the 1860s and was complete in 1870 under the name Charles Pratt & Company.  The Refinery was an instant success; both Charles Pratt and his Astral Oil—the name he gave the kerosene the Refinery produced—found great popularity.  Circa 1873, Pratt became a director of Standard Oil Company as his company was brought into Standard Oil.  The following year, Pratt's company was reorganized to act as a holding company for Standard Oil Company.  In 1892, following years of close corporate ties between the companies, Standard Oil Company purchased the property of Charles Pratt & Company, including the Refinery.  On information and belief, by this time, Standard Oil had also acquired Eagle Oil Company, which had established its Eagle Oil Works refinery near to the Pratt Works Refinery by

1868.  These acquisitions were part of a much larger Standard Oil program; the company would eventually own and operate fifty refineries in the area near Newtown Creek in Brooklyn.

28.     From 1870 through the early 1900s, the Pratt Works Refinery primarily manufactured, refined, and exported kerosene for illumination.  Crude oil would arrive via ships, railroad, or pipelines.  Once the crude oil was onsite, the manufacturing process involved four primary steps: (1) fractional distillation, in which petroleum was transferred into horizontal cylindrical stills and heated to force it to separate into its constituent components which were then run through cool running water and separated into a series of smaller tanks; (2) condensation of the kerosene distillate; (3) agitation of the distillate with acid in order to bleach and deodorize; and (4) agitation with caustic soda or ammonia in order to neutralize any acids remaining in the kerosene.

29.     Pratt's sales grew rapidly, and the Refinery expanded accordingly.  The Refinery only began operations around 1870, but by 1872 more than 250,000 families relied on Pratt's Astral Oil for their heating and cooking needs.  In 1872, Pratt Works was refining about seven million gallons of crude petroleum a year.  By 1876, the Refinery handled nearly forty-three million gallons of crude petroleum a year.  This translates to over 120,000 gallons of crude oil refined each day at Pratt Works.

30.     At its peak, the Refinery's operation was one of the largest of its kind in the country, employing over seven hundred individuals and handling more than sixty million gallons per year of kerosene, crude petroleum, refined oils, naphtha, tar, benzene, lubricating oils, gasoline, and turpentine.  The Refinery had in excess of forty tar and naphtha tanks onsite, as well as numerous oil/water/solid separation units.  Asbestos-containing material covered numerous pieces of

equipment at the Refinery.  The tanks, separation units, and other equipment released materials into the environment at the Refinery Site.

31.     As Pratt Works' kerosene production operations grew, the Refinery began a factory for constructing tin cans for use in canning and distributing kerosene.  By the late 1880s, the canning factory grew to occupy two floors of one of the buildings onsite.  The cannery's principal output was five-gallon cans for exporting refined oil.  In addition to the five-gallon cans, the cannery manufactured specialized transport containers, such as ten-gallon galvanized drums.  The cannery's success was such that at some point the cannery may have been the main operation at the Pratt Works as refining operations possibly halted altogether.  The Refinery housed numerous oil storage and filling tanks to manage shipments of kerosene.

32.     Based on information and belief, the canning and shipping operations of Exxon and/or its corporate predecessors Charles Pratt & Co., Astral Oil Company, and Standard Oil contributed to the handling, storage, treatment, and/or disposal of solid wastes and hazardous substances including metals, VOCs, and SVOCs, all of which remain at or adjacent to the Refinery Site and may present an imminent and substantial endangerment to health or the environment.

33.     To supply Standard Oil's ever-growing corporate holdings in Brooklyn, a Standard Oil Company pipeline snaked around the borough.  A Standard Oil affiliate built a 6" pipeline to serve Brooklyn-area refineries in 1879.  The pipeline extended beneath the Hudson River, through modern-day Central Park, and under the East River to Newtown Creek.

34.     In the early 1880s and into the early 1900s, Standard Oil extended the pipeline to the Refinery and the adjacent Williamsburg Works MGP.  That pipeline crossed Newtown Creek to the Sone and Fleming Oil Works.  From there, the pipeline extended down along Meserole Avenue south to Franklin Street near N. 15th Street, south on Franklin Street to N. 14th Street near

Block 2282, south along Kent Avenue, west through Block 2277, south across N. 12th Street through Block 2287, south across N. 11th Street to Block 2294 (Parcel 5), north across N. 11th Street through Block 2287, and north across N. 12th Street to Block 2277.  The Standard Oil pipeline ran through the Williamsburg MGP, connecting portions of the Refinery on Block 2277 and Block 2294.

35.    In the early 1930s, Standard Oil installed 6" steam piping running across the Williamsburg MGP.  This piping, installed 16-19' above N. 11th Street and N. 12th Street, conveyed steam between Standard Oil's operations at Block 2294 and Block 2277.

36.    On information and belief, another Standard Oil pipeline ran through the East River and into the northwest corner of Brooklyn.  This pipeline ran through the Brooklyn Navy Yard north to the Refinery Site.  Pipelines were the main method of transporting crude oil to the Refinery from the 1880s until approximately 1920, when barges became the primary method of transport. An asphalt dock on the East River accommodated barges, while an onsite railroad depot was also used to transport crude oil and export kerosene and other products.

37.    The Pratt Works Refinery was plagued with accidents, spills, and leaks.  In many instances, these problems arose before the crude oil even arrived at the Refinery.  Until 1907, the Refinery regularly combatted fires on the wooden sailing ships that were used to deliver crude oil in wooden barrels.

38.    Multiple fires ravaged the Refinery.  An 1871 fire was contained to a single oil tank, but another fire in the winter of 1873 consumed six stills full of crude oil and poured burning oil along the snow, creating spiral columns of fire which threatened to destroy the Williamsburg MGP.  The 1884 fire burned through eight tanks of crude oil, four tanks of naphtha, and one tank of tar.  That fire extended to the wharf where oil-filled schooners docked.  Boiling oil overflowed

from the sinking ships straight into the water, and a floating island of oil, 50-yards in diameter, was only contained by fire-boats.  In 1891 and 1895, explosions rocked the stills and distilling tanks at the Refinery.  In 1909, Bushwick Inlet caught fire when a boat passenger threw a cigar into the water and oil drainage from the Refinery was carried upstream.

39.     The many accidents, spills, leaks, and fires at the Pratt Works Refinery resulted in the handling, storage, treatment, and/or disposal of multiple contaminants, including kerosene, crude petroleum, refined oils, naphtha, tar, benzene, lubricating oils, turpentine, sludges, tank bottoms and sediments, solvents, acids, catalysts, and asbestos at the Refinery by Defendant Exxon and/or its corporate predecessors Charles Pratt & Co., Astral Oil Company, and Standard Oil.

40.     The Pratt Refinery utilized numerous gravitational and/or physical or chemical oil/water/solid separation units, such as ditches and other conveyances, sumps, stormwater units, tanks, induced air flotation units, and impoundments.  These separation units generated sludges that were disposed of into the environment at the Refinery.

41.     The Refinery used over forty tanks holding tar, oil, and materials that generated tank bottoms and sediments, which were discharged and released to the environment at the Refinery.  In addition, the materials contained within these tanks came into contact with or became entrained with the tank bottoms before they were discharged and released into the environment at the Refinery.

42.     Various solvents, acids, and catalysts were used and disposed of into the environment at the Refinery.

43.     Many structures contained asbestos, which also was disposed of into the environment at the Refinery.

- 10 -

44. Upon information and belief, the hazardous substances, including the non-marketable petroleum-based materials, became entrained with other materials at and adjacent to the Refinery Site.

45. Upon information and belief, these non-marketable petroleum wastes associated with the Pratt Works Refinery and other hazardous substances including slop oil, separator sludge, and tank bottom residue remain upon, and in the vicinity of, the Refinery Site in a manner that may present an imminent and substantial endangerment to health or the environment.

D. Investigatory and Remedial History of the Pratt Works Refinery

46. Initial investigations indicate that chemicals of concern ("COCs") attributable to the Refinery's historic operation as a petroleum distillation and refining facility including supporting filling, storage, transportation, production, waste generation and waste disposal operations likely include RCRA characteristic or listed hazardous waste, solid waste, and/or varies products, additives, byproducts, fuels, or waste that contain but are not limited to volatile organic compounds, semi volatile organics, TCLP semi-volatile organics, total metals, TCPL metals, acid extractibles, dioxins/furans, asbestos, total petroleum hydrocarbons (low and high boiling points), polynuclear aromatic hydrocarbons, oxygenates, fuel additives (1,2-dichloroethane, ethylene dibromide, lead, and others), PCBs, pesticides, free cyanide, and related tentatively identified compounds.

47. These COCs are potentially located at depths extending from the surface to a naturally occurring clay confining layer estimated to be at a depth ranging from 60 to 90 feet below grade. A remedial investigation capable of addressing relevant COCs at these depths would necessarily include the collection of soil, groundwater, and/or soil vapors via the appropriate site-specific technology based on access, geology, groundwater, buried waste, subsurface structures,

identified COC, quality assurance and quality control requirements, and other considerations not yet identified.

48.     The collection of these media for laboratory analysis commonly include the installation of soil borings (auger or direct push), monitoring wells, vapor sampling points, temporary monitoring wells, test pits, hang auger, grab or core samplers, passive diffusion sampling, direct push cone penetrometer, and/or other specialized sampling methods to address site conditions.

49.     The Brooklyn Union Gas Company's former Williamsburg MGP was located adjacent to and surrounded on two sides by the Refinery.  On information and belief, solid waste and hazardous substances from the Refinery have migrated – and continue to migrate – onto the parcels of land on which the Williamsburg MGP was located.

50.     This continued migration of contaminants precludes Plaintiff from fully and meaningfully remediating the former MGP site until Exxon investigates, characterizes, and remediates the Refinery Site.

51.     The New York State Department of Environmental Conservation has requested that Exxon investigate and remediate the Refinery Site (*see* Exhibit A), but, upon information and belief, Exxon has refused to do so.

52.     The New York State Department of Environmental Conservation has requested that National Grid investigate and remediate the Williamsburg MGP Site, and has stated that if National Grid fails to do so, it will conduct the investigation using State Superfund money and then seek to recovery its costs from National Grid. *See* Exhibit A.

53.     Unless and until Exxon investigates and remediates the Refinery Site, Plaintiff will be forced to investigate and remediate contamination that has migrated from the Refinery site to

the Williamsburg MGP Site, or to pay the New York State Department of Environmental Conservation's costs for investigating and remediating Exxon's contamination at the Williamsburg MGP Site.

54.     The COCs remain onsite in a manner that may present an imminent and substantial endangerment to health or the environment.

<b>COUNT I – RCRA 42 U.S.C. § 6972<br>INJUNCTIVE RELIEF AND CIVIL PENALTIES</b>

55.     Plaintiff hereby incorporates by reference all of the preceding allegations and makes them a part of this Count as if set forth fully at length herein.

56.     Section 7002 of RCRA, 42 U.S.C. § 6972 provides:

(a) In general. Except as provided in subsection (b) or (c) of this section, any person may commence a civil action on his own behalf—

(1)

>     (A) against any person (including (a) the United States, and (b) any other governmental instrumentality or agency, to the extent permitted by the eleventh amendment to the Constitution) who is alleged to be in violation of any permit, standard, regulation, condition, requirement, prohibition, or order which has become effective pursuant to this chapter; or
>
>     (B) against any person, including the United States and any other governmental instrumentality or agency, to the extent permitted by the eleventh amendment to the Constitution, and including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment; or

57.     Defendant ExxonMobil is a "person" within the meaning of RCRA, 42 U.S.C. § 6972(a)(1)(A) and (B).

58.    RCRA defines "solid waste" as "any garbage, refuse, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility and other discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, commercial, mining, and agricultural operations, and from community activities…" 42 U.S.C. § 6903(27).

59.    RCRA defines "hazardous waste" as "a solid waste, or combination of solid wastes, which because of its quantity, concentration, or physical, chemical, or infectious characteristics may--(A) cause, or significantly contribute to an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness; or (B) pose a substantial potential hazard to human health or the environment when improperly treated, stored, transported, or disposed of, or otherwise managed." 42 U.S.C. § 6903(5).

60.    RCRA defines "disposal" as "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters." 42 U.S.C. § 6903(3).

61.    RCRA defines "storage" as "the containment of hazardous waste, either on a temporary basis or for a period of years, in such a manner as not to constitute disposal of such hazardous waste." 42 U.S.C. § 6903(33).

62.    RCRA defines "treatment" as "any method, technique, or process, including neutralization, designed to change the physical, chemical, or biological character or composition of any hazardous waste so as to neutralize such waste or so as to render such waste nonhazardous, safer for transport, amenable for recovery, amenable for storage, or reduced in volume. Such term

includes any activity or processing designed to change the physical form or chemical composition of hazardous waste so as to render it nonhazardous."  42 U.S.C. § 6903(34).

63.    While under Defendant's ownership, control, and management, their facility generated "solid waste" and "hazardous waste" within the meaning of 42 U.S.C. § 6903(27) and 42 U.S.C. § 6903(5).

64.    Defendant ExxonMobil contributed to the handling, storage, treatment, and/or disposal of solid and hazardous wastes into the environment within the meaning of 42 U.S.C. § 6903(3), 42 U.S.C. § 6903(33), and 42 U.S.C. § 6903(34).

65.    The solid and hazardous wastes handled, stored, treated, and/or disposed of at the Defendant's facility remain onsite in a manner that may present an imminent and substantial endangerment to health or the environment.  42. U.S.C. § 6972(a)(1)(B).

66.    On or about September 21, 2017, Plaintiff served a notice of endangerment under RCRA Section 7002(b)(2)(a) to U.S. Environmental Protection Agency ("EPA") Administrator Scott Pruitt, EPA Region 2 Acting Administrator Catherine McCabe, Attorney General Jefferson Sessions, New York State Department of Environmental Conservation Commissioner Basil Seggos, New York State Assistant Attorney General Joseph Kowalczyk, and to Defendant ExxonMobil.

67.    Plaintiff has complied with the 90-day notice requirement of 42 U.S.C. § 6972(b)(2)(A).

68.    Neither the EPA nor New York State is diligently prosecuting Exxon nor has commenced any action under RCRA against Exxon to restrain or abate acts or conditions, which may have contributed or are contributing to the activities which may present the alleged endangerment.

69.     No responsible party is diligently conducting a removal action, Remedial Investigation and Feasibility Study, or proceeding with a remedial action pursuant to a court order, consent decree, or administrative order under RCRA with respect to the conditions which may have contributed or are contributing to the activities which may present the endangerment to the environment or human health.

70.     Pursuant to RCRA 42 U.S.C. Section 6972(a)(1)(b), Defendant is liable for all equitable relief, including, without limitation, a mandatory injunction to immediately implement remedial measures at the Refinery Site, civil penalties imposed against Defendant, and all costs of litigation, including, without limitation, reasonable attorneys' and expert witness' fees.

**WHEREFORE**, Plaintiff respectfully requests that this Honorable Court:

A.     Enter judgment for the Plaintiff;

B.     Declare that Defendant Exxon is in violation of RCRA;

C.     Declare that Defendant Exxon is responsible for investigation and remediation at the Pratt Works Refinery Site;

D.     Permanently enjoin Defendant Exxon to immediately investigate and remediate the Pratt Works Refinery Site to take all actions necessary to address imminent and substantial endangerment that may be presented by the solid and hazardous wastes at the Pratt Works Refinery Site;

E.     Order Defendant Exxon to pay civil penalties pursuant to 42 U.S.C. § 6928;

F.     Order Defendant Exxon to pay costs and attorneys' fees pursuant to 42 U.S.C. § 6972(e);

G.     Award such other relief as this Court deems just.

Respectfully submitted,
National Grid

By its Attorneys,
Dated: December 22, 2017

/s/  Edward K. Roggenkamp, IV
Edward K. Roggenkamp, IV (Bar ID ER7738)
J. Michael Showalter (Bar ID JS2757)
SCHIFF HARDIN LLP
666 Fifth Avenue, Suite 1700
New York, NY 10103
Phone:  312.258.5561
Fax:  312.258.5600
Email:  mshowalter@schiffhardin.com
Email:  eroggenkamp@schiffhardin.com

Russell Selman (*pro hac vice* forthcoming)
Bradley Rochlen (*pro hac vice* forthcoming)
Robert Middleton (*pro hac vice* forthcoming)
SCHIFF HARDIN LLP
233 S. Wacker Drive, Suite 6600
Chicago, IL 60606
Phone:  312.258.5500
Fax:  312.258.5600
Email:  rselman@schiffhardin.com
Email:  brochlen@schiffhardin.com
Email:  rmiddleton@schiffhardin.com